Scott **FITZGERALD**, Plaintiff,

v.

**GREEN VALLEY AREA EDUCATION AGENCY**, Defendant.

Civ. No. 80–482–C.

United States District Court,
S.D. Iowa, C.D.

May 17, 1984.

Mark W. Bennett, Babish, Bennett & Nickerson and Kathleen Keest, Legal Services Corp. Des Moines, Iowa, for plaintiff.

Mark L. Tripp, Des Moines, Iowa, for defendant.

## MEMORANDUM OPINION AND ORDER

STUART, Chief Judge.

In this civil rights action, which was tried to the Court on February 16, 1984, plaintiff claims that defendant Green Valley Area Education Agency (Green Valley) discriminatorily refused to hire him for a teaching position because of his physical disability. He alleges that Green Valley's actions violated § 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) and Iowa Code § 601A.6(1)(a) (1979). Plaintiff seeks a declaratory judgment, damages for loss of earnings and mental anguish, punitive damages and attorney's fees.

### I. *Jurisdiction and standing.*

The Court has federal question jurisdiction over plaintiff's Rehabilitation Act claim, and pendent jurisdiction over the state law claim.

At trial, the Court raised the question of whether plaintiff had standing to assert a § 504 claim, based on *Carmi v. Metropoli-* *tan St. Louis Sewer District,* 620 F.2d 672, 674–75 (8th Cir.), *cert. denied,* 449 U.S. 892, 101 S.Ct. 249, 66 L.Ed.2d 117 (1980). *Carmi* held, *inter alia,* that a plaintiff has no standing to bring an action for employment discrimination under § 504 unless one of the purposes of the federal financial assistance received by the defendant is to provide employment. However, twelve days after the trial of this action, the Supreme Court announced its decision in *Consolidated Rail Corp. v. Darrone,* —— U.S. ——, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984), which effectively overrules this aspect of *Carmi.* Therefore, it is unnecessary for the Court to determine whether providing employment is one of the purposes of the federal financial assistance which Green Valley receives.

### II. *Findings of fact.*

Based on the parties' pretrial stipulation and the evidence adduced at trial, the Court makes the following findings of fact.

Plaintiff, presently a resident of Vermont, is a multiply handicapped individual. His most apparent handicap is left side hemiplegia due to cerebral palsy. The hemiplegia is not a complete paralysis of plaintiff's left side; he has sufficient use of his left arm, hand and leg to be able to walk without assistance and to perform such functions as lifting children and driving. Plaintiff is licensed to drive in Vermont without restrictions. He was previously licensed to drive in New York, where he also had a chauffeur's license. In addition to cars, he has driven vans and a U-Haul truck without difficulty.

Plaintiff's other handicaps are nocturnal epilepsy and dyslexia. The epilepsy is controlled by medication, and plaintiff has never had a seizure while awake. Dyslexia is a reading disability. As a result of this handicap, plaintiff is able to read only between a 3rd and 6th grade level when he does his own reading visually. During college, he compensated for this problem just as many blind people do, through use of tape recordings and readers. Plaintiff's dyslexia did not prevent him from obtain-

ing a bachelor's and a master's degree, nor has it hindered his ability to work as a teacher's aide or substitute teacher for children whose reading skills are less than his, including normal 1st and 2nd graders.

As a handicapped child, plaintiff was taught by his parents that "there is no word 'can't' in the English vocabulary," and plaintiff worked hard since childhood to prove that he could accomplish what he wanted to do in spite of his handicaps. Upon graduation from high school in 1967, he attended Wayne State University in Detroit, Mich., graduating in June 1972 with a bachelor of arts degree in sociology and psychology (double major). Thereafter, he worked for Goodwill Industries and in a VISTA—Head Start program involving handicapped children before entering New York City's Bank Street College of Education for postgraduate work in the latter part of 1974. Bank Street College is an accredited, highly reputable school which is well known among educators for its graduate programs in education. Plaintiff received a master's degree from Bank Street College in June 1979, with a specialty in early childhood special education. Graduates of Bank Street education programs are automatically certified to teach in the State of New York upon graduation, and plaintiff was thus certified by the New York State Education Department to teach grades N–6 (nursery, kindergarten and 1–6) and special education.

Plaintiff took five years to complete his master's degree at Bank Street because he was attending school only part-time while working as a teacher's aide and assistant teacher in special education at Low Memorial Child Care Center, a day care/preschool in New York City with a full education program. The practicum portion of plaintiff's degree program at Bank Street was also completed at Low Memorial, under the supervision of certified teachers. Plaintiff's work at Low Memorial was with normal children age 3–5 and with handicapped children age 2–12, and it focused on both cognitive skills and gross motor skills. On occasion, plaintiff transported children during the course of his work at Low.

In the spring of 1979, plaintiff sent out about forty resumes in an effort to secure a job upon his graduation from Bank Street that June. One of these was sent in response to an ad placed by defendant Green Valley in the New York Times which stated that Green Valley had openings for, *inter alia*, a preschool teacher of the handicapped and a special education instructor. Plaintiff's response to this ad was mailed to Green Valley in early June; it included a cover letter and his Bank Street College transcript in addition to the resume. These materials did not include any mention of plaintiff's handicaps, as he had learned from prior experience that he would be unlikely to get a response if he did so. Sometime in June, plaintiff received a brief letter from Green Valley acknowledging receipt of his materials and enclosing a blank job application form for him to fill out. Plaintiff filled out the form and returned it to Green Valley.

There is a conflict in the evidence as to what happened next, but the Court finds the facts to be as follows. In early July 1979, after reviewing plaintiff's completed application, D.L. Steen, who was then assistant director of special education for Green Valley, telephoned plaintiff to express an interest in interviewing plaintiff for the position of preschool handicapped teacher in Green Valley's center-based program at Lamoni, Iowa. He told plaintiff he would have to pay his own travel expense for the interview, but that Green Valley might reimburse him if he were hired. After briefly discussing the job description and plaintiff's qualifications, Mr. Steen had plaintiff talk with a secretary, Jean Ide, to set up a date for an interview.

After arranging the interview in Iowa, plaintiff became concerned about the fact that he had not told Mr. Steen that he was handicapped. Given his limited financial resources, he was afraid to spend the $400 or $500 it would cost to fly to Iowa without Green Valley officials knowing in advance that he was handicapped. After discussing the problem with his supervisor at Low

Memorial, plaintiff decided to telephone Mr. Steen and tell him.

This phone call, from plaintiff to Mr. Steen, took place within a few days after the initial phone call from Mr. Steen to plaintiff. During this second call, plaintiff told Mr. Steen that he had left side hemiplegia, described the extent of that handicap,[1] and asked whether there would be any problem in that regard. Mr. Steen responded that the preschool handicapped teacher at the Lamoni center had to be able to drive a school bus, a requirement of which plaintiff had not previously been informed. Plaintiff then told Mr. Steen that he had a chauffeur's license and did transport students in New York. Mr. Steen replied that he didn't think there would be any problem, but that he would check on it and let plaintiff know if there was.

After talking with plaintiff, Mr. Steen contacted Dwight Carlson of the Iowa Department of Public Instruction's transportation division and learned from him that state law required that a person have full and normal use of both hands, both arms, both feet and both legs in order to qualify for a bus driver's permit.[2] Based on the rule and Mr. Steen's information about plaintiff's hemiplegia, Mr. Carlson told Mr. Steen that plaintiff would not qualify for a bus driver's permit. Mr. Steen then telephoned plaintiff and relayed this information to him. He told plaintiff that transporting students was a necessary part of the job and, because plaintiff could not obtain a bus driver's permit, it wouldn't be worth his time or money to travel to Iowa for the interview. At no time during any of his three conversations with plaintiff did Mr. Steen ever express any reservations about plaintiff's qualifications for the teaching portion of the job.

After this phone call, plaintiff felt a combination of inadequacy, anger and rejection. These feelings arose from his perception that, after he had worked so hard to get his master's degree and to overcome his handicaps, it was unfair for him to be excluded from a job opportunity simply because of a bus driving requirement—especially when he knew that in fact he *was* capable of safely driving a bus. Because he was a married man with a family, the incident also left plaintiff with fears about his ability to provide for his family. Finally, plaintiff felt embarrassment and humiliation when he had to tell his supervisor at Low Memorial that he wouldn't be going to Iowa for a job interview after all.

A day or two after receiving Mr. Steen's second phone call, plaintiff contacted a legal aid organization to see if anything could be done to redress the situation. This lawsuit followed.

Defendant Green Valley is one of 15 regional "area education agencies" (AEA's) in Iowa which provide support services such as media and special education to local school districts. Green Valley provides assistance for children from birth to age 21 in 22 local school districts. The services provided by each AEA vary, depending on what services are requested by the local school districts. In 1978–79, Green Valley provided instruction for preschool handicapped children through center-based special education programs at Lamoni and Creston. In 1979–80, a third center-based program was added at Osceola. Green Valley had five positions for teachers of the preschool handicapped during the 1979–80 school year.

Although the local school districts had a legal duty to provide children with transportation to and from the center-based programs, Green Valley had agreed to provide such transportation in the case of Lamoni because of a lack of interest in the program on the part of the person who served

---

**1.** At trial, neither plaintiff nor Mr. Steen could recall whether plaintiff had mentioned either of his other handicaps.

**2.** 670 Iowa Admin.Code § 22.15(2) (1979). As a result of this lawsuit, which originally included a challenge to the constitutionality of the cited rule, the rule was voluntarily amended in 1982 to permit individual evaluations of persons with less than full normal use of all limbs, hands and feet. Plaintiff then dropped his constitutional claim.

as Lamoni's school superintendent when the program in Lamoni was initiated. In 1978, a new superintendent took over at Lamoni, and talks began immediately concerning the Lamoni district's eventual assumption of responsibility for both transportation and instruction. However, it wasn't until August 1979 that the superintendent informed Green Valley that Lamoni would take over the transportation of children to and from the preschool handicapped program.[3] At the time Mr. Steen talked to plaintiff in July 1979, Mr. Steen assumed that Green Valley would continue to provide the transportation in 1979–80. He made no effort at that time to contact the new superintendent to see whether Lamoni would be able to provide the transportation.

Other than the teacher employed in the Lamoni program for 1978–79, no teacher employed by Green Valley has ever been required to drive a bus as a part of his or her duties, including Judith Gatton, the woman who was eventually hired for the job at Lamoni for 1979–80. Defendant's job description for a preschool handicapped teacher included no mention of bus driving.

Green Valley had the authority to transfer teachers from one center-based facility to another. The standard teacher employment contract used by Green Valley did not give the teacher a right to teach at any particular center. Mr. Steen gave no consideration to the possibility of transferring one of the other four teachers to Lamoni and assigning plaintiff to the post vacated by that teacher in the event plaintiff proved to be the best applicant, and he did not inform plaintiff of such a possibility. Another possibility which was neither considered by Mr. Steen nor mentioned to plaintiff was that of hiring an independent carrier to transport the Lamoni students.

Finally, based on the evidence adduced at trial, the Court finds that plaintiff was better qualified, both in terms of education and experience, to teach preschool handi-

capped children than was Judith Gatton, the woman hired for the 1979–80 Lamoni position. Were it not for the bus driving problem and plaintiff's hemiplegia, the Court finds it is more likely than not that plaintiff would have been hired in preference to Ms. Gatton.

### III.  *The Section 504 claim.*

Section 504 of the Rehabilitation Act of 1973 provides in pertinent part:

> No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

In order to establish his claim under § 504, plaintiff must prove each of the following elements by a preponderance of the evidence:

> (1) that the plaintiff is a "handicapped individual" under the terms of the statute;  (2) that the plaintiff is "otherwise qualified" to participate in the program or activity at issue;  (3) that the plaintiff was excluded from the program or activity "solely by reason" of her or his handicap;  and (4) that the program or activity receives federal financial assistance, or is conducted by an executive agency or the United States Postal Service.

*Plummer v. Branstad,* 731 F.2d 574 at 577 (8th Cir., 1984) (citing *Doe v. New York University,* 666 F.2d 761, 774–75 (2d Cir. 1981))..

▪ With regard to element (1), as mentioned earlier, plaintiff has nocturnal epilepsy, dyslexia and cerebral palsy with left side hemiplegia. There appears to be no dispute that plaintiff is a "handicapped in-

---

**3.** The Lamoni district did not take over the instruction portion of the preschool handi-

capped program until the 1980–81 school year.

dividual" as defined in 29 U.S.C. § 706(7), and the Court concludes that he is.

It is stipulated that defendant was at all times pertinent to this lawsuit a recipient of federal financial assistance, including funds received pursuant to the Education of the Handicapped Act (EHA), 20 U.S.C. § 1400 et seq. Defendant's receipt of EHA funds not only satisfies element (4), but also imposed upon defendant a duty to "take positive steps to employ and advance in employment qualified handicapped persons in programs assisted" by EHA funds. 45 C.F.R. § 84.11(2); *see also* 20 U.S.C. § 1405. It thus appears to the Court that, because the teaching position at issue in this lawsuit was in a program assisted by EHA funds, defendant's duty to take affirmative steps to accommodate for the handicap of a qualified applicant was greater than that imposed by § 504 on recipients of other types of federal aid. As will be seen subsequently, this heightened duty affects the analysis of issues which arise in connection with element (2).

The Court also finds that plaintiff has met his burden of proving the third element listed above. First, it is clear that § 504's prohibition of discrimination applies to recruitment and to the processing of applications for employment, which is the stage at which plaintiff was effectively eliminated from consideration for the job in question; the prohibition also applies to job assignments, job descriptions and any other term or condition of employment. 45 C.F.R. § 84.11(b)(1), (4) and (9). In this case, the only reason plaintiff was told it would be futile to come for the interview was that his handicap would prevent him from obtaining a bus driver's permit. There is no evidence that defendant had any other reason in July 1979 for suggesting to plaintiff that it would not be worthwhile to interview him.

The remaining issue, then, is whether plaintiff was "otherwise qualified" for the position of teacher of preschool handicapped children. In the employment context under § 504, the regulations define a qualified handicapped person as one "who, with reasonable accommodation, can perform the essential functions of the job in question". 45 C.F.R. § 84.3(k)(1). In *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the Supreme Court held that in order to be consistent with the legislative intent behind § 504, the implementing regulations could not be interpreted as imposing an obligation on all recipients of federal funds to make substantial modifications in their programs in order to accommodate the needs of the handicapped. *Id.* at 407–12, 99 S.Ct. at 2367–70. However, the Court acknowledged that accommodation may be required by § 504 when it would not impose an undue financial or administrative burden:

> We do not suggest that the line between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons always will be clear. It is possible to envision situations where an insistence on continuing past requirements and practices might arbitrarily deprive genuinely qualified handicapped persons of the opportunity to participate in a covered program. Technological advances can be expected to enhance opportunities to rehabilitate the handicapped or otherwise to qualify them for some useful employment. Such advances also may enable attainment of these goals without imposing undue financial and administrative burdens upon a State. Thus, situations may arise where a refusal to modify an existing program might become unreasonable and discriminatory.

*Id.* at 412–13, 99 S.Ct. at 2370.

As noted earlier, however, Congress has chosen to impose a more significant duty of affirmative action on recipients of EHA funds. *See* 20 U.S.C. § 1405. Although the Court is not aware of any case in point, it would appear logical that when a § 504 defendant is a recipient of EHA funds, the "reasonable accommodation" question should be analyzed in terms of this special obligation rather than the less-

er duty imposed by § 504 on recipients of federal aid in general.

In the case at bar, aside from the bus driving requirement, plaintiff was clearly qualified and able to perform all the essential functions of a preschool handicapped teacher without any accommodation on defendant's part.[4] The accommodation question arises only in connection with the bus driving requirement. Defendant Green Valley, of course, cannot be held responsible for the fact that state law imposed a physical requirement for school bus drivers, nor did Green Valley itself have the power to make an exception and permit plaintiff to drive a bus. Rather, the issues before the Court are whether defendant could have accommodated plaintiff by eliminating the need for him to perform the bus-driving duty, and whether it would have imposed an undue financial or administrative burden on defendant to do so.

There were at least three possible means of eliminating the need for plaintiff to drive a school bus. First, defendant could have asked the Lamoni school district to assume its legal responsibility for transporting the students. Second, it could have considered transferring a different teacher to Lamoni and placing plaintiff in a center where transportation duty was not required.[5] Third, it could have hired an independent carrier to transport the students. The first two possibilities would have imposed no financial burden on defendant, and probably very little administrative burden. The Court concludes that either one would clearly be considered reasonable, even under the standard enunciated in *Davis*. The third possibility would have involved some cost to defendant, but defendant made no showing that it would have been a substan-

tial burden. Although the hiring of an independent carrier presents a closer question than the first two possibilities, the Court believes that it would also be considered reasonable under the *Davis* standard. However, even if this alternative would be considered to go beyond what § 504 requires of federal aid recipients in general, it certainly would fall within the range of positive steps required to be taken by EHA fund recipients to facilitate the hiring of qualified handicapped persons.

Although the Court finds that there were several reasonable accommodations available, the Court does not believe the inquiry should end there under the circumstances of this case. Given the preliminary nature of the discussions between plaintiff and defendant, the question arises whether defendant had a duty to consider possible accommodations when plaintiff made no inquiry as to whether accommodations might be available. It may be that if plaintiff had raised the issue instead of filing a lawsuit, defendant would have recognized the availability of the options and encouraged plaintiff to come for the interview. On the other hand, it may be understandable that plaintiff would not make such an inquiry, because defendant's statements gave the impression that bus driving was an absolutely necessary duty, and plaintiff had no information which would suggest to him that any accommodations could be made.

The Court concludes that if defendant were not a recipient of EHA funds, its actions under the circumstances of this case would not violate § 504; however, the special duty imposed on EHA fund recipients compels a different result in this case. The Court does not believe defendant's failure to consider available alternatives to

---

4. Although plaintiff did not have an Iowa teaching certificate at the time he applied for the job, the Court finds that he would have been able to obtain temporary certification, as did Ms. Gatton, the woman actually hired to fill the position at Lamoni. If plaintiff was lacking in any course requirements, the certification could have been made contingent on the completion of the coursework, as was done in Ms. Gatton's case. Thus, the fact that plaintiff lacked Iowa certification or may have been lacking a course

or two required for permanent Iowa certification provides no basis for concluding that he was not qualified for the job.

5. The court notes that 45 C.F.R. § 84.12(6) lists job restructuring as one example of reasonable accommodation. Job restructuring may entail shifting nonessential duties to other employees. 45 C.F.R. § 84, Appendix A, Subpart B, Paragraph 16.

accommodate plaintiff's known handicap and to inform him of that possibility was improperly motivated. However, as a recipient of EHA funds, the defendant must have been aware of its duty to "take positive steps" to employ qualified handicapped persons in programs assisted by those funds. By failing to consider alternatives that would have eliminated the bus driving requirement, defendant failed to fulfill the special obligation imposed on it to accommodate plaintiff's handicap.

To avoid any misunderstanding, the Court points out that defendant was not required by § 504 to actually implement any of the available accommodations prior to deciding whether to hire plaintiff. The problem with defendant's handling of the situation lies in the fact that defendant gave plaintiff the impression that coming for the interview would be futile, and that defendant neither considered whether accommodation was possible nor suggested to plaintiff that it might be.

The Court concludes that, considering defendant's special obligation, plaintiff has met his burden of establishing all the elements of his § 504 claim.

### IV. *The state law claim.*

Iowa Code § 601A.6(1)(a) (1979) makes it illegal for any person to "discriminate in employment against any applicant for employment or any employee because of the ... disability of such applicant or employee, unless based upon the nature of the occupation." Implementing regulations provide that an employer has a duty to make reasonable accommodation to the handicap of an otherwise qualified applicant, and that "[a]n employer may not deny any employment opportunity to a qualified handicapped employee or applicant if the basis for the denial is the need to make reasonable accommodation to the physical ... limitations of the employee or applicant." 240 Iowa Admin. Code § 6.2(6) and (6)(c); *see also Foods, Inc. v. Iowa Civil Rights Commission,* 318 N.W.2d 162, 166–67, 169 (Iowa 1982). The employer can avoid its duty to make a reasonable accom-

modation only if it can show "that the accommodation would impose an undue hardship on the operation of its program." § 6.2(6).

■ The Court believes that the duties imposed by Iowa Code § 601A.6(1)(a) are similar to those imposed on federal aid recipients *in general* under § 504. The special duty imposed on EHA fund recipients by federal law should not be considered in conjunction with plaintiff's state law claim. Therefore, based on the Court's finding that defendant's actions under the circumstances of this case would not have violated § 504 if defendant had not been a recipient of EHA funds, the Court concludes that defendant did not violate § 601A.6(1)(a).

### V. *Relief.*

Plaintiff has requested a declaratory judgment, damages for loss of earnings and mental anguish, punitive damages and attorney's fees.

■ There is a split of authority as to whether damages are available under § 504. *See Nelson v. Thornburgh,* 567 F.Supp. 369, 382–83 (E.D.Pa.1983), and cases cited therein. However, for the reasons stated in *Nelson,* 567 F.Supp. at 382–83, the Court concludes the better view is that the full panoply of remedies is available to a private plaintiff under § 504.

■ Although punitive damages are presumably available under § 504, the Court finds that the assessment of such damages against defendant is not justified under the facts of this case.

The Court finds that plaintiff is entitled to damages for mental anguish in the amount of $1,000.

With regard to damages for loss of earnings, the evidence shows that plaintiff would have earned $12,650 for the 1979–80 school year, had he been hired by defendant. Although the figures presented by plaintiff were not precise, it appears to the Court that plaintiff actually earned about $7,500 during that nine-month period in

other jobs he obtained. Based on the Court's finding that plaintiff would have been hired over Ms. Gatton but for the bus driving problem and plaintiff's handicap, the Court concludes that plaintiff is entitled to damages in the amount of $5,150 for loss of earnings in 1979–80. There is insufficient evidence that defendant would have had a job available for plaintiff after 1979–80 to support a damage award for loss of earnings beyond that school year.

Attorney's fees are available under § 505. 29 U.S.C. § 794a(b). As the prevailing party, plaintiff is entitled to an award for attorney's fees in a reasonable amount to be determined by the Court upon the submission of proper documentation by a statement of plaintiff including settlement efforts.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED:

(1) That defendant violated plaintiff's rights respecting plaintiff's application for employment as a teacher of the preschool handicapped, in that defendant's actions violated Section 504 of the Rehabilitation Act of 1973.

(2) That plaintiff is entitled to actual damages for loss of earnings and mental anguish in the total amount of $6,150.

(3) That plaintiff is not entitled to an award of punitive damages.

(4) That plaintiff is entitled to reasonable attorney's fees in an amount to be determined by the Court upon the submission of proper documentation by plaintiff, which shall be filed within fifteen (15) days from the date this Order is filed.

(5) That the Clerk shall enter judgment in accordance herewith.