**Toni RECANZONE, Plaintiff,**

v.

**WASHOE COUNTY SCHOOL DISTRICT, a political subdivision of the State of Nevada; Robert Gray, Gerald Myers; Does I–XXV, Defendants.**

**No. CV–R–86–264 BRT.**

United States District Court,
D. Nevada.

Oct. 7, 1988.

Pinkerton & Polaha, Graham Galloway, Reno, Nev., for plaintiff.

Erickson, Thorpe, Swainston & Co., William C. Jeanney, Reno, Nev., for defendants.

## MEMORANDUM OPINION

BRUCE R. THOMPSON, District Judge.

This action claims defendants Washoe County School District, Robert Gray, Principal of Marvin Picollo School, and Gerald Myers, Director of Special Education for the Washoe County School District, discriminated against plaintiff Toni Recanzone solely on the basis of her handicaps in her employment for which she was otherwise qualified in violation of Section 504 of the Rehabilitation Act. Toni Recanzone also asserts that defendants conspired to discriminate, and discriminated against her in an intentional and malicious manner.

Toni Recanzone has physical disabilities which include a tongue which is tied down and impedes her ability to speak clearly, a left hand with only three digits, a right hand which is severed above the wrist, and feet the toes of which had been webbed together at birth and were separated surgically. These disabilities were present at birth, requiring annual operations and persistent efforts by her parents to help her overcome them. As a result of their extraordinary efforts, plaintiff developed a high self-esteem and did not consider herself handicapped. She possessed a you-can-do-anything-you-want-to attitude which enabled her to lead a normal and fulfilling life.

In December of 1980, plaintiff received a teaching degree in special education from the University of Nevada, and subsequently was licensed by the state of Nevada as a special education teacher, preparing her to achieve her goal to assist other handicapped individuals. A special education program is defined by Nevada statute N.R.S. 395.008: " 'Special education program' means a program which provides instruction specially designed in accordance with minimum standards prescribed by the state board of education to meet the unique needs of handicapped persons."

In early 1981, plaintiff applied for a teaching position with the Washoe County School District, and also placed herself on the list of persons available for substitute teaching. As a substitute teacher for more than three and a half years, she successfully completed all assignments and received high praise for her performances. In 1981, she substituted under a short term contract at Agnes Risley Elementary School, whose principal, Mr. Theodore H. Lokke, wrote a glowing letter of recommendation. Despite similar praise for more than three years throughout the school district, she received no offers of permanent employment. At the present, there are only two handicapped individuals teaching in the Washoe County School District. One deaf person teaches hearing impaired children sign language. The other, having only one leg, is a speech clinician.

In January 1984, plaintiff successfully substituted under a federally funded six month temporary contract at Marvin Picollo School, a recipient of federal funds. The

focus of Marvin Picollo School is upon the education and supervision of handicapped children, whose handicaps vary from emotional to severe physical and mental disabilities. Some of the children can be trained to function in society, while others are unteachable and cannot tend to any basic personal needs.

In the spring of 1984, Marvin Picollo School had four teaching positions available. Defendants offered these positions to Sally Peterschmidt, Joe Saunders, Mary Sheehy and Toni Recanzone. Plaintiff received the only temporary contract offer of the four. For the school year 84–85, defendant Washoe County School District offered forty-five regular contracts to teach special education classes. Twenty-two of those went to persons who had no prior teaching experience as employees of the Washoe County School District, yet they received regular, permanent contracts. Toni Recanzone received only a temporary one year contract. At the time, plaintiff did not realize the distinctions between her contract offer and those offered to her three colleagues. All but Joe Saunders accepted by signing letters of intent. Joe Saunder's contract was offered to Pam Jarek, a student teacher, whom Mr. Gray had had little opportunity to observe. No thought was given to offer this permanent contract to plaintiff. The only explanation given for Pam Jarek's contract is unacceptable. Defendants argue plaintiff signed a letter of intent which could not be altered. Its unchangeability is unsupported by the evidence. In short, plaintiff received the less desirable contract, even though she possessed three years of substitute teaching experience, and Pam Jarek had no experience. The Court infers that plaintiff received the lesser contract because she was handicapped, and not for the pretextual reason stated.

Defendants Gerald Myers and Robert Gray were responsible for deciding teacher assignments, and were acting within the scope of their employment. The testimony of Diane Early shows defendants were apprised of plaintiff's disabilities. Both defendants admitted they gave *no* consideration to her disabilities in assigning a class.

Mr. Gray made the final decision on the composition of the class, which the previous year had been part of a larger class. Plaintiff's class was comprised of eight multiply handicapped children, who ranged from 13 years to 20 years old and weighed in excess 100 pounds. On the other hand, an able-bodied teacher received the other half of the divided class, which was comprised of the younger and smaller children.

The eight children of plaintiff's class were altogether incapable of receiving academic instruction. Instead, plaintiff babysat these children, changing their diapers and feeding them. Plaintiff received the most difficult and demanding class at Marvin Picollo. The class provided her with no intellectual satisfaction or fulfillment.

The previous school year had revealed the brighter side of Marvin Picollo. Plaintiff was assisting in a class of eleven children and had special responsibility for one small child who was capable of some instruction albeit limited, in contrast to the nonteachable children in her present class. Plaintiff did not learn of her class composition until a few days before class began and was apprehensive about the class after learning about its composition. She related her apprehensions about the class to her father and to Mr. Gray, but she believed she could succeed with proper assistance which was promised. Defendants failed to provide her with proper assistance.

At first, Mr. Paul Mendive, a large man, assisted plaintiff in her class. After one month he requested a transfer. Mr. Gray testified that plaintiff requested that Mr. Mendive be transferred, but the Court finds the evidence supports Mr. Mendive's testimony.

Mrs. Linda Abernathy replaced Mr. Mendive as plaintiff's teaching assistant. One month passed before Mrs. Abernathy made it known that she was pregnant and began missing class often. When Mrs. Abernathy was absent, defendants failed to provide adequate assistance. As a direct result, plaintiff began to lose confidence in her ability to teach. In late December, Mrs. Abernathy took maternity leave, and de-

fendants failed to provide plaintiff with an assistant. Defendants failed to find an assistant until February, 1985.

By then, plaintiff had exhibited symptoms characteristic of multiple sclerosis and viral myelitis. Defendants received notice that plaintiff was not to lift, but her condition worsened. The physicians never came to a conclusive diagnosis nor do they understand the causes of the aforementioned diseases. When questioned whether the lifting demanded of plaintiff could have aggravated or activated her condition, the medical experts responded, it could have, but current medical knowledge does not include the causes and could not say with a reasonable degree of certainty what activated plaintiff's condition.

Plaintiff's condition increased her absenteeism, which prompted defendants not to renew her contract in March, 1985. However, in April, 1985, defendants offered to retain her for the remainder of her contract if she remained in the same class. By then, she had recovered sufficiently to finish the school year, but only if she could teach a less physically demanding class. Mr. Gray refused to transfer another teacher to plaintiff's class, since in his opinion it would be unfair and an imposition to require another teacher to take her class. Consequently, plaintiff was unable to finish the school year. These events left her discouraged, and caused her to give up her intensive desire to teach handicapped people. Instead, plaintiff changed to education for counseling. The related facts caused plaintiff severe psychological trauma and mental and emotional distress, pain and suffering.

The discussion in the note in Volume 97 Harvard Law Review page 997 "Employment Discrimination Against the Handicapped and Section 504 of the Rehabilitation Act: An Essay on Legal Evasiveness" highlights the problems in the instant case. It emphasizes the ambiguity of the word "discrimination" and the obvious ambiguity of legislative intent as expressed by the statutory language. It is noted, for example, that § 503 of the Rehabilitation Act of 1973 requires federal contractors to "take

affirmative action to employ and advance in employment qualified handicapped individuals" (29 U.S.C. § 793), while § 504 omits this express statutory admonition with respect to employers in programs receiving federal financial assistance. (29 U.S.C. § 794). This statute provides:

§ 794. **Nondiscrimination under Federal grants and programs; promulgation of rules and regulations**

No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.

The Harvard Law Review dichotomy of the "equal treatment" or "equal impact" analysis of § 504 has been recognized by the Supreme Court in *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) where Justice Marshall observed:

In addition, much of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult if not impossible to reach were the Act construed to proscribe only conduct fueled by a discriminatory intent. For example, elimination of architectural barriers was one of the central aims of the Act, *see, e.g.,* S.Rep. No. 93–318, p. 4 (1973), U.S. Code Cong. & Admin.News 1973, pp. 2076, 2080, yet such barriers were clearly not erected with the aim or intent of excluding the handicapped.

Similarly, Senator Williams, the chairman of the Labor and Public Welfare Committee that reported out § 504, asserted that the handicapped were the victims of '[d]iscrimination in access to public transportation' and '[d]iscrimination because they do not have the simplest forms of special educational and rehabilitation services they need....' 118 Cong.Rec. 3320 (1972). And Senator Humphrey, again in introducing the proposal that later became [504, listed, among the instances of discrimination that the section would prohibit, the use of 'transportation and architectural barriers,' the 'discriminatory effect of job qualification ... procedures,' and the denial of 'special educational assistance' for handicapped children. *Id.*, at 525–526. These statements would ring hollow if the resulting legislation could not rectify the harms resulting from action that discriminated by effect as well as by design.

\* \* \* \* \* \*

█] Any interpretation of § 504 must therefore be responsive to two powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds. Given the legitimacy of both of these goals and the tension between them, we decline the parties' invitation to decide today that one of these goals so overshadows the other as to eclipse it. While we reject the boundless notion that all disparate-impact showings constitute prima facie cases under § 504, we assume without deciding that § 504 reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped. On that assumption, we must then determine whether the disparate effect of which respondents complain is the sort of disparate impact that federal law might recognize.

Earlier in *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the Supreme Court dealt with a contention that a federally assisted state educational institution was required to make expensive alterations to its program of nursing instruction to accommodate a hearing impaired person. The contention was rejected, and the Court, somewhat ambiguously, opined:

> Here, neither the language, purpose, nor history of § 504 reveals an intent to impose an affirmative-action obligation on all recipients of federal funds. Accordingly, we hold that even if HEW has attempted to create such an obligation itself, it lacks the authority to do so.

IV

We do not suggest that the line between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons always will be clear. It is possible to envision situations where an insistence on continuing past requirements and practices might arbitrarily deprive genuinely qualified handicapped persons of the opportunity to participate in a covered program. Technological advances can be expected to enhance opportunities to rehabilitate the handicapped or otherwise to qualify them for some useful employment. Such advances also may enable attainment of these goals without imposing undue financial and administrative burdens upon a State. Thus, situations may arise where a *refusal to modify an existing program might become unreasonable and discriminatory.* Identification of those instances where a refusal to accommodate the needs of a disabled person amounts to discrimination against the handicapped continues to be an important responsibility of HEW.

In this case, however, it is clear that Southeastern's unwillingness to make major adjustments in its nursing program does not constitute such discrimination....

The regulations promulgated pursuant to § 504 recognize the vitality of the equal impact and modified affirmative action concepts in relation to federally funded programs in state institutions. 45 C.F.R. Part 84 (1984):

§ 84.3 **Definitions.**

. . . . .

(2)(k) 'Qualified handicapped person' means:

(1) With respect to employment, a handicapped person who, *with reasonable accommodation,* can perform the essential functions of the job in question;

**§ 84.4 Discrimination prohibited.**

.     .     .     .     .

(b) **Discriminatory actions prohibited.**

(1) A recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap:

(ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others;

.     .     .     .     .

(4) A recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration

(i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons, or (iii) that perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same State.

(Emphasis supplied).

■ The prohibition of discrimination applies to job assignment and any other term or condition of employment. *Fitzgerald v. Green Valley Area Education Agency,* 589 F.Supp. 1130, 1136 (S.D.Ia.1984). Reasonable accommodation may compel a county to provide an interpreter so that deaf people can serve as jurors. *Greater Los Angeles Council on Deafness v. Zolin,* 812 F.2d 1103, 1107 (9th Cir.1987). (The court recognized the viability of the issue but reserved it for initial decision by the district court on remand).

The requirements of proof in a Rehabilitation Act case have been enunciated by the Ninth Circuit in *Reynolds v. Brock,* 815 F.2d 571 (9th Cir.1987):

■ To establish a prima facie case of wrongful termination under the Rehabilitation Act, Reynolds must demonstrate both (1) that she is an 'otherwise qualified handicapped individual' for purposes of the Act and (2) that she was terminated because of her handicap. If she can establish a prima facie case of wrongful termination, then the burden of producing evidence shifts to the defendant, who must demonstrate a legitimate nondiscriminatory reason for terminating her. *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715–16, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983); see *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *McDonnell–Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

The *Reynolds* case concerns an employee of a federal agency, to whom different, but not dissimilar regulations are applicable. The same analysis, however, is found in cases affecting employees of state agencies receiving federal funds. *Norcross v. Sneed,* 755 F.2d 113 (8th Cir.1985). *Fitzgerald v. Green Valley, supra. See also Sisson v. Helms,* 751 F.2d 991 (9th Cir. 1985).

It is obvious, and uncontested, that Miss Recanzone falls within the definition of a handicapped person. There is no dispute in the evidence that she is otherwise qualified to serve as a special education teacher despite her handicaps. In fact, in recommending her for employment, defendant Myers, the Director for Special Education, wrote: "Miss Recanzone has had one short-term contract at Agnes Risley Elementary School and many experiences substituting in various elementary and middle schools. Her personal and professional recommendations are excellent."

█] The preponderance of the evidence shows that plaintiff has been discriminated against in the following particulars: Over a period of more than three years she was not offered a standard teacher's contract by the School District; in the spring of 1984 she was offered a temporary one-year contract when three standard contract openings were available and this discrimination was made even more obvious when a standard contract opening was available in August 1984 and was not offered to her; she was assigned to the most difficult, unfulfilling class of students in Marvin Picollo School; although promised the adequate assistance which all such teachers received and needed, it was not provided for her; the reasons provided by defendants, as shown by the evidence, are not legitimate nondiscriminatory reasons; no consideration was given to her handicaps in making decisions to hire her; she could not be considered for a standard contract because she had already signed a letter of intent for a temporary contract; she was assigned to the most difficult, burdensome class of students deliberately and for no particular reason; and the paucity of adequate assistance and failure to provide in advance for Mrs. Abernathy's maternity leave were thoughtless neglect. In no instance was an affirmative effort made to recognize and acknowledge Miss Recanzone's known handicaps and to make reasonable adjustments and accommodations for them. This was what the law required. She was discriminated against solely on the basis of her handicaps.

█ Damages are an appropriate remedy in a private action under § 504 of the Rehabilitation Act. *Kling v. County of Los Angeles*, 769 F.2d 532 (9th Cir.1985). Plaintiff seeks damages for medical expenses, loss of salary, reeducation expenses, general living expenses and emotional pain, suffering and distress. Plaintiff cannot be allowed a recovery for medical expenses for diagnoses and treatment of multiple sclerosis or viral myelitis from which she suffered in the Spring and Summer of 1985 because the medical witnesses were unable to relate these diseases to any conditions of her employment. Causation was not proved, except by *quod hoc ergo proctor hoc*, a logical fallacy. While the hiring practices of the Washoe County School District vis-a-vis plaintiff are unexplained, there is no evidence that she was discriminated against solely because of her handicaps until August of 1985, and she was compensated for the full 1984–85 school year pursuant to her contract. After that she decided to retire from special education. So we see no basis for allowing damages for loss of salary. (Plaintiff claims $21,793 for lost wages since 1981). On the other hand, it appears to this Court that conduct in violation of the Rehabilitation Act of 1973 under the circumstances shown by the evidence here should generate a reasonable anticipation that reeducational expenses would be incurred and that the claim for $4,954.17 for expenses not otherwise reimbursed for training to become a counselor may properly be allowed.

█ Of course, the evidence of severe psychological trauma and severe mental and emotional distress, pain and suffering, is the foundation for the principal claim for general damages. The plaintiff's yearning to qualify as a special education teacher to permit other children to overcome handicaps as she had overcome her own was deep-seated. It was shattering to her psychologically and emotionally to learn that her goals could not be accomplished. Her distress has been severe and lasting and she is just beginning to enjoy a complete recovery from it. We think it appropriate to assess $70,000 as compensation for these damages.

The foregoing shall constitute the Court's findings of fact and conclusions of law.

Accordingly,

IT HEREBY IS ORDERED that judgment shall be entered in favor of plaintiff and against defendants for $74,954.17, together with costs.