**Iris Velia RIVERA FLORES, Plaintiff,**

v.

**PUERTO RICO TELEPHONE COMPANY, Defendant.**

**Civ. No. 89–1697 HL.**

United States District Court, D. Puerto Rico.

Sept. 5, 1991.

---

**62**

Guillermo J. Ramos–Luina, Hato Rey, P.R., for plaintiff.

Rogelio Capestany–Morales, San Juan, P.R., for defendant.

## OPINION AND ORDER

LAFFITTE, District Judge.

The question before the Court is whether, pursuant to the Rehabilitation Act of 1973, an employee who alleges discrimination based on her physical disability may seek compensatory damages for mental anguish. Plaintiff Iris Velia Rivera Flores (Rivera), an employee with the Puerto Rico Telephone Company (PRTC), alleges that PRTC discriminated against her because of an ophthalmic condition that causes Rivera impaired eyesight. Jurisdiction is based on §§ 504 and 505(a)(2) of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794, 794a(a)(2) (1985 & Supp.1990). Rivera also cites this Court's pendent jurisdiction over claims arising under Article II, § 8 of the Constitution of the Commonwealth of Puerto Rico; Articles 1802 and 1803 of the Civil Code of Puerto Rico, 31 L.P.R.A. §§ 5141 and 5142; and Public Law No. 44 of July 2, 1985, as amended, 1 L.P.R.A. § 501, *et seq.* Rivera seeks compensatory and punitive

damages, as well as injunctive relief. She has demanded a jury trial.

PRTC moves to dismiss Rivera's claim for monetary damages, pursuant to Federal Rule of Civil Procedure 12(b)(6), on the ground that this type of relief is not contemplated by § 504 of the Rehabilitation Act. PRTC claims that a successful § 504 plaintiff is limited to an equitable remedy including injunctive relief and back pay. Consequently, PRTC moves to strike Rivera's request for a jury trial. Additionally, PRTC asserts that Rivera's local claims predominate with respect to the comprehensiveness of the remedies, and therefore requests that the Court decline to exercise pendent jurisdiction. For the following reasons, the Court grants PRTC's motions.

### I.

The Rehabilitation Act is designed to promote and expand employment opportunities for the disabled in both the public and private sectors. To this end, § 504 of the Act prohibits discrimination against disabled individuals in federal programs and by any recipient of federal funds.[1] In relevant part, § 504 states that "[n]o otherwise qualified individual with handicaps in the United States ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a).[2] In 1978, Congress added § 505(a)(2) to the Act, 29 U.S.C. § 794a(a)(2), incorporating the "remedies, procedures, and rights" of Title VI of the Civil Rights Act of 1964 for claimants aggrieved under § 504.[3] Beyond this reference to Title VI remedies, there is a dearth of Congressional discussion on the scope of

---

1. Sections 501 and 503 of the Rehabilitation Act prohibit the federal government and most federal contractors from discriminating in employment and require the use of affirmative action to employ disabled individuals. Section 502 relates to physical accessibility.

2. PRTC does not dispute that Rivera falls within the definition of an "otherwise qualified individual" under the Rehabilitation Act. *See* 29 U.S.C. § 706(8)(A) and (B).

3. Section 601 of Title VI, 78 Stat. 252, as amended, 42 U.S.C. § 2000d, provides:

    "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

available relief under § 504. And unfortunately, Title VI provides little assistance, as the breadth of damages available under that Title remains unsettled.

In *Guardians Ass'n v. Civil Service Comm'n of City of New York,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), a badly fragmented Supreme Court affirmed the judgment of the Second Circuit Court of Appeals denying back pay in a Title VI action, absent proof of discriminatory intent.[4] In construing Title VI, a different majority of the Court implied only that some form of monetary relief would be available for cases of intentional discrimination.[5] Thus, while the Court precluded a cause of action for damages for unintentional discrimination, it left the question open as to whether compensatory damages for intentional discrimination may be sought.

Following on the heels of *Guardians,* the Supreme Court, in *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984), explicitly applied Title VI jurisprudence to § 504 of the Rehabilitation Act, albeit in a limited context for present purposes.[6] Relying on Guardians, and noting that intentional discrimination had been alleged, the Court stated that the death of the plaintiff did not moot the case since his estate could at least bring an equitable action for back pay. *Id.* at 630, 104 S.Ct. at 1252. The Court, however, expressly declined to determine whether money damages, beyond back pay, are available under § 504. *Id.*

In the wake of these decisions and in the absence of any legislative guidance, courts are fairly evenly divided on whether § 504 of the Rehabilitation Act contemplates damages beyond back pay.[7] The issue of remedies under § 504 has surfaced but has not been squarely addressed by the First Circuit. *See Hurry v. Jones,* 734 F.2d 879, 886 (1st Cir.1984) (finding no need to reach the question); *Ciampa v. Massachusetts Rehabilitation Comm'n,* 718 F.2d 1 (1st Cir.1983) (assuming without deciding that a private action for damages is implied by

**4.** Justices White and Rehnquist expressly reached this conclusion. Justice Powell and Chief Justice Burger held that no private relief should ever be granted under Title VI. Justice O'Connor concurred to the extent that she would deny all relief absent intentional discrimination. *Guardians,* 463 U.S. at 607, n. 27, 103 S.Ct at 3235, n. 27.

**5.** Justice White, joined in relevant part by Justice Rehnquist, suggested that "it may be that the victim of the intentional discrimination should be entitled to a compensatory award, as well as to prospective relief...." *Guardians,* 463 U.S. at 597, 103 S.Ct. at 3230. Justice Marshall stated that an award of compensatory relief is appropriate regardless of proof of discriminatory intent. *See Id.* at 615, 103 S.Ct. at 3239 (Marshall, J., dissenting). Justice Stevens, joined by Justices Blackmun and Brennan, noted that both prospective and retroactive relief were fully available to Title VI claimants, but wrote that in any event, the relief sought should be available "in *this* case because the petitioners have sought relief under 42 U.S.C. § 1983" and "§ 1983 provides a damage remedy." *Id.* at 638, 103 S.Ct. at 3251 (emphasis in original).

**6.** The thrust of the Court's opinion concerned whether to limit actions for employment discrimination under § 504 to situations where the "primary objective" of Federal financial assistance is to promote employment. The Court held that this restriction, embodied in § 604 of

Title VI, 42 U.S.C. § 2000d–3, should not be extended to a cause of action under the Rehabilitation Act.

**7.** Cases holding that damages are available beyond back pay are: *Smith v. Barton,* 914 F.2d. 1330 (9th Cir.1990); *Miener v. State of Missouri,* 673 F.2d 969 (8th Cir.1982); *Recanzone v. Washoe County School District,* 696 F.Supp. 1372 (D.Nev.1988); *Fitzgerald v. Green Valley Area Education Agency,* 589 F.Supp. 1130 (S.D.Iowa 1984); *Nelson v. Thornburgh,* 567 F.Supp. 369 (E.D.Pa.1983); *Gelman v. Department of Education,* 544 F.Supp. 651 (D.Colo.1982); *Hutchings v. Erie City And County Library Board Of Directors,* 516 F.Supp. 1265 (W.D.Pa.1981); *Patton v. Dumpson,* 498 F.Supp. 933 (S.D.N.Y.1980); *Poole v. South Plainfield Board Of Education,* 490 F.Supp. 948 (D.N.J.1980). Cases favoring a limitation of monetary relief to back pay are: *Rhodes v. Charter Hospital,* 730 F.Supp. 1383 (S.D.Miss.1989); *Marshburn v. Postmaster General of United States,* 678 F.Supp. 1182 (D.Md.1988); *Shuttleworth v. Broward County,* 649 F.Supp. 35 (S.D.Fla.1986); *Byers v. Rockford Mass Transit District,* 635 F.Supp. 1387 (N.D.Ill.1986); *Martin v. Cardinal Glennon Memorial Hospital For Children,* 599 F.Supp. 284 (E.D.Mo.1984); *Bradford v. Iron County C–4 School District,* 36 F.E.P.Cases 1296, 1984 WL 1443 (E.D.Mo.1984); *Longoria v. Harris,* 554 F.Supp. 102 (S.D.Tex.1982); *Ruth Anne M. v. Alvin Independent School District,* 532 F.Supp. 460 (S.D.Tex.1982).

§ 504); *see also Glanz v. Vernick*, 750 F.Supp. 39, 42 (D.Mass.1990) (assuming without deciding that damages are available under § 504). The Court thus proceeds to examine the question as a matter of first impression in this Circuit.

## II.

PRTC's Fed.R.Civ.P. 12(b)(6) motion for failure to state a claim can be successful only if "it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory." *Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 52 (1st Cir.1990). In making this determination the Court must indulge all reasonable inferences in favor of the plaintiff. *See Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir.1989). Nevertheless, "unsubstantiated conclusions" or "bald assertions" need not be credited." *Correa–Martinez*, 903 F.2d at 52.

Rivera's argument in favor of the availability of damages is essentially one of statutory construction. She asserts that absent any indication that Congress intended to limit a § 504 plaintiff to equitable relief, the Court should make use of its plenary power and award the full panoply of remedies. This proposition hinges on the principle articulated in *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), where the Supreme Court stated that "where legal rights have been invaded and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Id.* at 685, 66 S.Ct. at 777. Subsequently, the Supreme Court noted that "the existence of a statutory right implies the existence of all necessary and appropriate remedies." *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 239, 90 S.Ct. 400, 405, 24 L.Ed.2d 386 (1969).

Rivera relies specifically on *Nelson v. Thornburgh*, 567 F.Supp. 369 (E.D.Pa. 1983). In that case, Judge Pollak, relying on *Bell v. Hood*, reasoned that the lack of

congressional discussion limiting the remedial scope of § 504 implies a "tacit acceptance of the presumption 'that a wrong must find a remedy.'" *Id.* at 383 (quoting *Miener v. Missouri*, 673 F.2d 969, 978 (8th Cir.1982)). While this view finds support in the case law, *see supra* n. 8, the Court is not persuaded that Congress intended such a broad remedy to be afforded to § 504 plaintiffs.

██ Where, as here, a statute is facially silent, resort to the application of *Bell v. Hood* and the imposition of an implied remedy should not be automatic. Rather, the *Bell v. Hood* principle must yield to contrary legislative intent. In determining whether a particular remedy is implied in a congressional statute, a task analogized to "counting angels on the head of a pin," *Lieberman v. University of Chicago*, 660 F.2d 1185, 1193 (Swygert, J., dissenting), the Court must remain consistent with the legislative scheme, its purpose and its objectives. *Cannon v. University of Chicago*, 441 U.S. 677, 688, n. 9, 99 S.Ct. 1946, 1953, n. 9, 60 L.Ed.2d 560 (1979). The Court must also refrain from independently determining whether, in its view, a damages remedy appropriately serves the common weal. Instead, it must seek out intimations in legislative commentaries, in the statutory purpose, in the overall congressional scheme, and in the interplay with sister statutes in a search for what Congress intended to do.

In approaching this task, the Court also notes the *Bell v. Hood* presumption's inverse proposition articulated in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), that "where a statute expressly provides a particular remedy … a court must be chary of reading others into it." *Id.* at 19, 100 S.Ct. at 247.[8] The Court is also guided by the maxim *expressio unius est exclusio alterius* which reflects a basic principle of statutory construction—that a statute providing for a particular remedy precludes, by implication, other remedies.

---

**8.** *See Lieberman v. University of Chicago*, 660 F.2d 1185, 1187 n. 4, 1192 (7th Cir.1981), for a discussion alluding to the apparent inconsisten-

cy between these two principles of statutory construction.

*Botany Worsted Mills v. United States,* 278 U.S. 282, 289, 49 S.Ct. 129, 132, 73 L.Ed. 379 (1929), *cited in National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974).

### III.

We begin our foray into the legislative history by looking for any direct authoritative evidence of the existence of an implied damages remedy for § 504 plaintiffs. The only evidence of this nature appears in a 1979 commentary of the Senate Committee on Labor and Human Resources addressing a proposed amendment to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* adding the handicapped to its protected groups. Speaking about Title V of the Rehabilitation Act, the Committee stated that it "has always been the Committee's intent that any handicapped individual aggrieved by a violation of Title V has the right under existing law to proceed privately in federal court and to enforce the rights and remedies afforded under Title V of the Rehabilitation Act of 1973, as amended, and to receive *back pay* and attorney's fees if successful." S.Rep. No. 96–316, 96th Cong., 1st Sess., pp. 12–13 (1979) (emphasis added). While not dispositive, the Court views this commentary as evincing legislative intent to *limit* relief to back pay, rather than affording an individual the full panoply of remedies.[9]

Less direct, but more extensive discussion of the legislative purpose behind the enforcement of § 504 appears in the Senate Conference Committee Report on the 1974 amendments to the Rehabilitation Act. That commentary stresses the parallel relationship between § 504 and the enforcement mechanisms of Title VI:

> Section 504 was patterned after, and is almost identical to, the antidiscrimination

language of section 601 of the Civil Rights Act of 1964 ... (relating to race, color, or national origin), and section 901 of the Education Amendments of 1972 ... (relating to sex). The language of section 504, in following the above-cited Acts ... envisions the implementation of a compliance program which is similar to those Acts, including promulgation of regulations providing for investigation and review of recipients of Federal financial assistance, attempts to bring non-complying recipients into voluntary compliance through informal efforts such as negotiation, and the imposition of sanctions against recipients who continue to discriminate.... Such sanctions would include, where appropriate, the termination of Federal financial assistance.... Implementation of section 504 would also include pre-grant analysis of recipient to ensure that Federal funds are not initially provided to those who discriminate against handicapped individuals. Such analysis would include pre-grant review procedures and a requirement for assurances of compliance with section 504. This approach ... would ensure administrative due process (right to hearing, right to review), provide for administrative consistency within the Federal government as well as relative ease of implementation, and permit a judicial remedy through a private action.

S.Rep. No. 93–1297, 93d Cong., 2d Sess. 27 (1974) *reprinted in* [1974] U.S.Code Cong. & Ad.News 6373, 6390–91. It is evident from a reading of this commentary that Congress was primarily concerned with borrowing the procedural safeguards of Title VI in order to create a similar administrative structure for *governmental* enforcement of § 504. *See Ruth Anne M v. Alvin Independent School Dist.,* 532 F.Supp. 460, 472 (S.D.Tex.1982). Although the report clearly indicates the availability

---

9. While this commentary is subsequent to the legislation in question, it is still a useful means of assessing prior legislative intent. *See Chrysler Corp. v. Brown,* 441 U.S. 281, 300, 99 S.Ct. 1705, 1717, 60 L.Ed.2d 208 (1979); *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969); *see also Darrone,* 465 U.S. at 631 n. 10, 104 S.Ct. at 1253

(alluding to this post-enactment commentary as evidence of the intent of Congress at the time of its passage). This is especially so since the Labor and Human Resources committee was comprised of 11 of the 16 members of the 1973 committee which reported the Rehabilitation Act.

of a private right of action, absent is any hint that an employer would be obligated to disgorge huge sums of money to a successful plaintiff in a damages action. Instead, the discussion is preoccupied with administrative remedies, and emphasizes a concern for administrative due process. As stated in one legislative commentary, the purpose behind the incorporation of Title VI remedies was to assure "administrative consistency with the Federal Government." S.Rep. No. 95–890, P. 19 (1978).

The Senate Conference Committee Report also emphasizes that penalties to encourage compliance with § 504's mandate are to come in the form of sanctions, including the termination of federal funding. Were the additional penalty of damages also available, the deterrent effect of these sanctions would be vitiated, rendering a discussion of them somewhat superfluous, since damages could potentially eclipse monetary sanctions, if not the federal funding itself. Moreover, while the availability of damages would also help to deter discrimination, the huge financial burden resting on the employer's shoulders might act to significantly discourage the acceptance of federal assistance. This would curtail the very purpose of the funding legislation—to promote and expand opportunities for the handicapped. *See Alvin,* 532 F.Supp. at 473.

Rivera argues, however, that the ultimate penalty of cutting off federal funds to the non-complying recipient is of little utility to the aggrieved individual. She finds support for this view in *Miener v. Missouri,* 673 F.2d 969 (8th Cir.1982), *cert. denied,* 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982). There, the Eighth Circuit concluded that administrative sanctions, such as the termination of federal funds, are "inadequate to vindicate individual rights and ... Congress could not have expected the individual plaintiff to be made whole through" such procedures. *Miener,* at 978. Making the individual whole is not entirely consistent with the legislative plan underlying the Rehabilitation Act. As previously noted, the Act is patterned after Title VI, and Title VI is not designed primarily to help the individual. *See McGuin-*

*ness v. United States Postal Service,* 744 F.2d 1318, 1321 (7th Cir.1984); *Greater Los Angeles Council on Deafness, Inc. v. Community Television of Southern California,* 719 F.2d 1017, 1021 (9th Cir.1983); *Pushkin v. Regents of University of Colorado,* 658 F.2d 1372, 1381–82 (10th Cir. 1981). Rather, it is designed to ensure the compliance of its mandate through administrative enforcement procedures, with the ultimate threat of refusing "to grant or to continue assistance" to any recipient of federal funds in the event of non-compliance. § 602, 42 U.S.C. § 2000d–1. Beyond the fact that there is no ameliorating language in Title VI with respect to the individual, the enforcement language stresses that penal action should be taken only if "compliance cannot be secured by voluntary means." *Id.* Thus, embodied in the administrative enforcement provisions is a clear preference for voluntary compliance, rather than for prolonged litigious battles over large monetary damage claims.

What emerges from an examination of the legislative evidence, circumstantial though it might be, is the necessity to adopt a balanced approach to the question of available remedies. According to the Supreme Court, "[a]ny interpretation of § 504 must ... be responsive to two powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds." *Alexander v. Choate,* 469 U.S. 287, 299, 105 S.Ct. 712, 719, 83 L.Ed.2d 661 (1985). Awarding damages for mental anguish has the potential to stretch § 504 beyond its manageable bounds. As one court observed, "[t]he incremental remedial and deterrent effect that would be occasioned by damages for mental anxiety or humiliation does not warrant imposing significant added demands on funds intended to reach other innocent beneficiaries of federal financial assistance programs ... § 504 was not intended to create general tort liability." *Bradford v. Iron County C–4 School District,* 36 F.E.P.Cases 1296, 1301, 1984 WL 1443 (E.D.Mo.1984) (citations omitted). *See also Rhodes v. Charter Hospital,* 730 F.Supp.

1383, 1385 (S.D.Miss.1989) (denying damages under § 504 in light of sizeable monetary awards); *Shuttleworth v. Broward County*, 649 F.Supp. 35, 38 (S.D.Fla.1986) (denying damages for mental suffering to a § 504 plaintiff in order to keep the statute within manageable bounds).

■ An examination of the overall legislative scheme provides further support for the conclusion that Congress did not intend monetary damages beyond back pay to be awarded to the aggrieved plaintiff under § 504. The Court finds it instructive that Congress passed Title V of the Rehabilitation Act, as well as Title VI of the Civil Rights Act, pursuant to the Spending Clause. In *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 15, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981), the Supreme Court characterized grants under the Spending Power as conditional and consensual, much like a contract: the grantee considers the advantages and disadvantages of accepting the federal benefits before agreeing to comply with the federally imposed requirements. A recipient of federal funds has the option of complying with the obligations inherent in the statute, or of terminating the benefits. *Id.* at 29, 101 S.Ct. at 1546; *see also Rosado v. Wyman*, 397 U.S. 397, 420–21, 90 S.Ct. 1207, 1221–1222, 25 L.Ed.2d 442 (1970) (noting the alternative choices of conforming to federal law or withdrawing from the program entirely).

While *Pennhurst* did not concern an implied damage remedy, its broader principle is applicable here. In *Pennhurst* the Court stressed that "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously. By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* 451 U.S. at 17, 101 S.Ct. at 1540. The degree of liability is obviously an important factor to be considered by a recipient of federal funds when assessing future obligations. If that liability were to include the possibility of huge monetary damages, Congress would likely have provided the federal grantees some forewarning. The legislative record, however, is devoid of any reference to this type of liability. Thus, as a matter of statutory construction, the Court concludes that had Congress wished to create such a remedy, it would have made its intent known.[10]

The Court finds the holding of *Franklin v. Gwinnett County Public Schools*, 911

10. In his dissenting opinion in *Lieberman v. University of Chicago*, 660 F.2d 1185, 1189–1195 (1981), Judge Swygert reasoned, in the context of Title IX, that the analogy to the Spending Power discussion in *Pennhurst* is inappropriate where the courts have implied a private cause of action. Judge Swygert suggested the inconsistency in expecting Congress to explicitly provide a damage remedy for an implied private cause of action. *Id.* at 1190. The Supreme Court has emphasized, however, that an implied cause of action "is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive." *Davis v. Passman*, 442 U.S. 228, 239, 99 S.Ct. 2264, 2274, 60 L.Ed.2d 846 (1979). In terms of unanticipated burdens facing the recipient of Federal funds, *who* may bring an action to enforce the statutory mandate seems less of a concern to a grantee than the type of relief available.

Justice White, in *Guardians*, 463 U.S. at 596–603, 103 S.Ct. at 3229–3233, also made much of the Spending Clause analogy to *Pennhurst* in the context of the availability of a remedy under Title VI. He expressly declined, however, to extend the analogy to situations involving intentional discrimination, noting that in "cases where intentional discrimination has been shown, there can be no question as to what the recipient's obligation under the program was and no question that the recipient was aware of that obligation. In such situations, it may be that the victim of the intentional discrimination should be entitled to a compensatory award...." *See id.* at 597, 103 S.Ct. at 3230.

While this discussion seems to mitigate somewhat the import of the Spending Clause analogy to cases of intentional discrimination, we note that the scope of the term "compensatory damages" as used in *Guardians*, is not entirely clear. *See Bradford v. Iron County C–4 School District*, 36 F.E.P. Cases 1296, 1984 WL 1443 (E.D.Mo. 1984). In *Bradford*, the court concluded that the Supreme Court used compensatory damages to describe only retrospective equitable damages in order to distinguish it from prospective injunctive relief which would require the expenditure of public funds. We note only that the discussion of compensatory damages in *Guardians* is largely dicta—and quite oblique dicta at that. As Justice Powell presciently noted, "[o]ur opinions today will further confuse rather than guide." 463 U.S. at 608, 103 S.Ct. at 3235 (Powell, J., concurring).

F.2d 617 (11th Cir.1990), persuasive. That Court discussed the Spending Clause in relation to damages under Title VI and, after noting that courts should proceed with extreme care when asked to find a right to compensatory relief in a statute enacted pursuant to Spending Clause legislation, *id.* at 622, concluded that damages were unavailable under Title VI.[11] *See also Davis v. Spanish Coalition For Jobs, Inc.*, 676 F.Supp. 171 (N.D.Ill.1988) (concluding that Title VI does not make monetary damages available for intentional discrimination). Similarly, we find that compensatory damages may not be had in § 504 action.

This conclusion is buttressed by an examination of the interplay between § 501 and § 504 of the Rehabilitation Act. Section 501, 29 U.S.C. § 791, requires federal agencies to adopt affirmative action plans for employment of the handicapped. Enforcement of § 501 is governed by § 505(a)(1), 29 U.S.C. § 794a(a)(1), which incorporates the rights and remedies of Title VII of the Civil Rights Act of 1964.[12] It is well settled that Title VII is limited to equitable relief, including injunctions and back pay.[13] Section 504, on the other hand, sweeps more broadly, prohibiting discrimination in federal government programs as well as by any recipient of federal financial assistance.

Since it is clear that § 504 also reaches claims of employment discrimination, *Darrone*, at 631–36, 104 S.Ct. at 1253–55, there is an overlap between the two provisions with respect to federal employees.[14] If § 504 allowed a plaintiff to seek damages, alternative remedies for the same violation committed by the same employer would result. This would enable a federal employee to circumvent § 501 in order to seek a greater remedy under § 504—an incongruous result that could not have been contemplated by Congress.

Moreover, even if § 501 were meant to provide the sole avenue of redress for a federal employee,[15] affording a greater remedy under § 504 would base differing damage awards on the nature of the disabled individual's employment. Federal employees would be restricted to receiving back pay while employees with agencies that receive federal financial assistance would be afforded damages. This would be both unjust and contrary to the legislative objective of requiring the federal government to be an equal opportunity employer on par with recipients of federal funds.[16] Senator Cranston, in the context

---

**11.** *Franklin* involved an action under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 (1988), but as Title IX was patterned after Title VI, the court discussed the two titles interchangeably.

**12.** 42 U.S.C. § 2000e *et seq.* The addition of § 505(a)(1) to the Rehabilitation Act was meant to afford the disabled the same rights provided individuals discriminated against in employment based on race, color and national origin. *See* S.Rep. No. 95–890, p. 18 (1978).

**13.** For the reach of damages under Title VII, *see Curtis v. Loether*, 415 U.S. 189, 196–97, 94 S.Ct. 1005, 1009–10, 39 L.Ed.2d 260 (1974); *Muldrew v. Anheuser–Busch Inc.*, 728 F.2d 989 (8th Cir. 1984); *Walker v. Ford Motor Co.*, 684 F.2d 1355 (11th Cir.1982); *Marshburn v. Postmaster General of The United States*, 678 F.Supp. 1182, 1184 (D.Md.1988), *aff'd*, 861 F.2d. 265 (4th Cir.1988).

**14.** The Seventh Circuit, in *McGuinness v. United States Postal Service*, 744 F.2d 1318, 1322 (7th Cir.1984), discussed this overlap with respect differing exhaustion requirements, and held that § 504 is assimilated with § 501 "as far as federal employers are concerned, making it a

matter of merely technical interest whether both statutes, or only the latter, create a remedy for federal employment discrimination against the handicapped." *Accord Boyd v. United States Postal Service*, 752 F.2d 410, 413 (9th Cir.1985); *Smith v. United States Postal Service*, 742 F.2d 257 (6th Cir.1984); *Prewitt v. United States Postal Service*, 662 F.2d 292, 304 (5th Cir.1981). The Court finds that the Seventh Circuit's interpretation is equally applicable to the question of available relief.

**15.** *See e.g. Smith v. United States Postal Service*, 570 F.Supp. 1415, 1418–19 and n. 2 (E.D.Mich. 1983) (concluding that the language of § 505(a)(2) excludes certain federal employees who remain covered by the remedies of § 505(a)(1)).

**16.** Although § 501 and § 503 do not expressly contain the nondiscrimination provision found in § 504, they do require the use of affirmative action in the employment of disabled individuals. As Judge Goldberg pointed out in his dissenting opinion in *Rogers v. Frito–Lay, Inc.*, 611 F.2d 1074, 1091 n. 15 (5th Cir.1980), the affirmative action concept embodies a prohibition of

of a proposed amendment reducing the scope of the federal government's obligation under § 501, warned that such an amendment would "create an unwise and unrealistic distinction with respect of employment between the obligations of the Federal Government and the obligations of Federal contractors and grantees ... requiring more of its grantees and contractors than it would be willing to require of itself." Cong.Rec.S. 15664, at 15665–66. Thus, it is unlikely that Congress intended to limit a § 501 plaintiff to back pay while affording a greater remedy to a plaintiff aggrieved under § 504.[17]

Further evidence supporting the limitation of § 504 damages to back pay can be gleaned by way of analogy to the Americans with Disabilities Act of 1990, 104 Stat. 327, 42 U.S.C. § 12101 (ADA). The ADA establishes a clear, comprehensive prohibition of discrimination on the basis of one's disability and provides a national mandate with strong enforceable standards to bring the disabled into the mainstream of American life. *See* 42 U.S.C.A. § 12101(b). Title I of the ADA prohibits discrimination

against the handicapped in employment and covers all employers, including state and local governments and governmental agencies.[18]

A critical element of the ADA's passage was the provision limiting Title I remedies to those available under Title VII of the Civil Rights Act of 1964.[19] In limiting disabled employees to the recovery of the equitable remedies of Title VII, Congress remained consistent with its general policy of "encouraging mediation and conciliation in resolving disputes and in avoiding unnecessary litigation" in employment discrimination. *Id.* at 141. Awarding the full array of damages to a § 504 plaintiff, simply because her employer receives federal funds, would run counter to this policy of promoting prompt resolution of disputes with full reimbursement of any lost wages to the aggrieved employee.

As with the interplay between § 501 and § 504 of the Rehabilitation Act, such an award would also create inconsistent remedies depending on whether the particular government agency in question is a recipient of federal funds. A § 504 plaintiff who

discrimination and thus represents a more comprehensive statutory mandate than § 504. *See also Southern Illinois Builders Ass'n v. Ogilvie,* 471 F.2d 680, 684 (7th Cir.1972) ("affirmative action imparts more than the negative obligation not to discriminate"); 41 C.F.R. § 60–741.4 (1978) (affirmative action clause in contract explicitly prohibits discrimination).

17. The objective behind the 1978 Amendments adding title VII enforcement remedies to aggrieved plaintiffs under § 501 was to "make it stronger and easier to enforce and to provide the same civil rights protection to the disabled that other minorities have in employment with the Federal Government." S.Rep. No. 95–890, p. 18 (1978). Congress hoped to attain this goal in part by making available back pay to a prevailing party.

18. In relevant part, title I states that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a). The employer must be engaged in an industry affecting commerce with "15 or more employees for each working day in each

of 20 or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 12111(5)(A). The United States, Indian tribes and private tax exempt membership clubs are excluded from the purview of title I. *See* 42 U.S.C.A. § 12111(5)(B).

19. One Congressional report stated that "[a]fter intense negotiations between the Senate and the Bush Administration, an agreement was reached ... to, among other items, delete the reference to Section 1981 procedures from the employment remedies provision.... Thus, the ADA's employment remedies were limited to current Title VII remedies: back pay, injunctive relief, reinstatement and attorneys' fees. With this significant change, the Bush Administration and the business community gave their support to the bill." H.R.Rep. 101–485(III), U.S.Code Cong. & Admin.News 1990, pp. 267, 506–07, 1990 WL 121680 at 137, May 15, 1990. Another Congressional report noted that "[t]he Minority Members of this Committee supported this bill on the assumption that the agreement as struck in the Senate ... with regard to remedies would be adhered to. That agreement, again, was to delete punitive and compensatory damages from the bill and to adopt current Title VII remedies of injunctive relief and lost back pay and benefits." H.R.Rep. 101–485(II), U.S.Code Cong. & Admin.News 1990, p. 444, May 15, 1990.

works for a recipient of federal funds could reap the benefits of that funding by seeking monetary damages, while a fellow employee at a non-federally funded governmental agency or private business would have to be content with the receipt of back pay under Title I of the ADA. The Court does not believe that this inequitable result was intended by Congress.

Additionally, the Court notes that Title II of the ADA, which prohibits discrimination in public services and by entities providing public transportation,[20] adopts the remedies found in the enforcement provisions of § 505 of the Rehabilitation Act. 42 U.S.C. § 12133. The ADA does not distinguish, however, between § 505(a)(1) and § 505(a)(2). Section 505(a)(2), as noted at the outset, incorporates the rights and remedies of Title VI for violations of § 504. Section 505(a)(1) incorporates the rights and remedies of Title VII for violations of § 501. The failure of Congress to differentiate between these two subsections seems to imply that the remedies afforded plaintiffs under § 501 and § 504 are coextensive.

Title II of the ADA also includes both federally and nonfederally funded entities. Affording disabled victims of discrimination the same remedy irrespective of whether the employer receives federal funds, intimates that the distinction of funding is immaterial to the extent of relief available. That being the case, the Court finds no distinguishing feature of § 504 that would warrant a larger recovery for a disabled employee than would be awarded a person discriminated against based on race, color or national origin under Title VII of the Civil Rights Act. *See Bradford,* 36 F.E.P. Cases at 1301 (E.D.Mo.1984).

Lastly, the Court notes that it is unlikely that Congress contemplated large monetary awards given the nature of the discrimination at issue. The Court finds the First Circuit's opinion in *Vazquez v. Eastern Air Lines, Inc.,* 579 F.2d 107 (1st Cir.

1978), instructive. *Vazquez* considered whether damages for pain and suffering are authorized under the Age Discrimination in Employment Act of 1967 (ADEA).[21] Even though the ADEA specifically mentions the availability of legal or equitable relief, the First Circuit concluded that compensatory damages for pain and suffering were not intended by Congress. While the Court's holding was expressly limited to the facts before it, the underlying reasoning remains relevant here.

The Court noted that "most of the discrimination against older employees was premised on lack of understanding and outworn prejudices" and that accordingly, "Congress indicated a preference for educating employers to the reality that older employees are no less productive on the average than younger ones." *Id.* at 111–112. The Court also pointed out that "the invidious hostility which permeates other forms of discrimination (e.g., race, national origin, creed) is not present among those with age prejudice. The discrimination is primarily one of incorrect assumptions...." *Id.* at 112. This, in part, led the Court to conclude that the administrative enforcement mechanisms of the Fair Labor Standards Act of 1938, 29 U.S.C. § 216(b), which Congress grafted onto the ADEA, were an adequate means of effectuating the objective of broadening employment opportunities for the elderly.

In a like vein, discrimination against individuals with disabilities generally emanates from similar misconceptions that disabled individuals cannot perform certain work, rather than the intentional overt prejudice alleged here. *See e.g., Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) (deaf student rejected from nursing program on the belief that her disability disqualified her from becoming a nurse). As the Supreme Court observed, "Federal agencies and commentators on the plight of the handi-

---

**20.** Specifically, title II states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be

subjected to discrimination by any such entity." 42 U.S.C.A. § 12132.

**21.** 29 U.S.C. § 621 *et seq.*

capped ... have found that discrimination against the handicapped is primarily the result of apathetic attitudes rather than affirmative animus." *Alexander v. Choate*, 469 U.S. 287, 296, 105 S.Ct. 712, 718, 83 L.Ed.2d 661 (1985). Consequently, most of the actions under § 504 revolve around the issue of when the failure to accommodate a disabled individual becomes illegal discrimination and what it means to be an "otherwise qualified" person. *Smith v. Barton*, 914 F.2d 1330, 1339 (9th Cir. 1990) (citing B.L. Schlei & P. Grossman, *Employment Discrimination Law*, 281 (2d ed. 1983)).

The Court believes that Congress intended to rely mainly on the administrative procedures of Title VI to combat this type of discrimination and that Congress did not intend the auxiliary remedy of damages to be available. In so concluding, the Court is mindful of the twin objectives underlying the Rehabilitation Act: to increase opportunities for individuals with disabilities, and to penalize those who attempt to impede their advancement into the mainstream of American life. Adhering to the sage advice of Judge Learned Hand, that statutes "should be construed, not as theorems of Euclid, but with some imagination of the purposes which lie behind them" *Lehigh Valley Coal Co. v. Yensavage*, 218 F. 547, 553 (2d Cir.1914), *quoted in Vazquez*, 579 F.2d at 112, the Court finds that the balance between these two objectives is best struck by allowing a prevailing plaintiff to obtain injunctive relief, back pay and attorneys' fees and by denying compensatory damages for mental suffering.

### IV.

■ Section 504 is silent as to the availability of the right to a jury trial. Moreover, Title VI of the Civil Rights Act, to which the Court refers for the scope of § 504's rights and remedies, contains no explicit grant of a jury trial. Cases have generally assumed, however, that § 504 does not afford a jury trial. *See e.g., Smith v. Barton*, 914 F.2d 1330, 1336 (9th Cir.1990) (no statutory entitlement under § 504 to a jury trial); *Doe v. Region 13 Mental Health–Mental Retardation Comm'n*, 704 F.2d 1402, 1407 n. 3 (5th Cir.1983) ("jury trials do not appear to be a matter of right under the Rehabilitation Act"); *Shuttleworth v. Broward County*, 639 F.Supp. 654, 661 (1986) (no right to a jury trial for a § 504 plaintiff).

Because the Court has concluded that the remedies available to a § 504 plaintiff are limited to the equitable type remedies of Title VII of the Civil Rights Act, we look to cases interpreting Title VII. Although the Supreme Court recently stated that it has never held that a plaintiff seeking back pay has the right to a jury trial, *Chauffeurs, Teamsters And Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 110 S.Ct. 1339, 1348, 108 L.Ed.2d 519 (1990), in *Great American Federal Savings and Loan Ass'n v. Novotny*, 442 U.S. 366, 375, 99 S.Ct. 2345, 2350, 60 L.Ed.2d 957 (1979), the Supreme Court noted that courts have consistently denied the right to a jury trial under Title VII.[22] Accordingly, the Court finds that § 504 provides no statutory right to a jury trial.[23]

### V.

■ Turning to the question of Rivera's pendent claims, the Court initially notes that the exercise of pendent jurisdiction is committed to the informed discretion of the trial court. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Thus, where the state and federal claims derive from a common nucleus of operative facts, *id.* at 725, 86 S.Ct. at 1138, courts may still decline to exercise jurisdiction in the presence of other considerations. The Supreme Court in *Gibbs* enumerated several factors including where the state issues substan-

---

**22.** *See Slack v. Havens*, 522 F.2d 1091, 1094 (9th Cir.1975); *EEOC v. Detroit Edison Co.*, 515 F.2d 301, 308 (6th Cir.1975); *Johnson v. Georgia Highway Express*, 417 F.2d 1122, 1125 (5th Cir. 1969).

**23.** The Court underscores the fact that the back pay available is *equitable* in nature. As such, the Seventh Amendment guarantee to a jury trial is inapplicable. *See Terry*, 110 S.Ct. at 1348; *Curtis v. Loether*, 415 U.S. 189, 197, 94 S.Ct. 1005, 1010, 39 L.Ed.2d 260.

tially predominate in terms of the comprehensiveness of the remedy sought. *Id.* at 726, 86 S.Ct. at 1139. In the interest of comity, *Gibbs* also advises courts to avoid unnecessary adjudication of thorny state law claims that might be better decided by the local tribunals. *Id.* at 726, 86 S.Ct. at 1139.

Here, Rivera's non-federal claims unquestionably predominate in terms of the comprehensiveness of the remedies available. Under the Rehabilitation Act, Rivera is limited to an award of injunctive relief and back pay. Rivera's non-federal claims, however, permit the full recovery of damages for mental anguish.[24] Since these claims, totalling six million dollars in damages, predominate over the federal claim, which gives rise only to injunctive relief and back pay, the Court finds it appropriate to dismiss Rivera's pendent claims without prejudice. *See Linares v. University of Puerto Rico,* 722 F.Supp. 910, 912 (D.P.R.1989); *Wescott v. Wackenhut Corporation,* 581 F.Supp. 9, 9–10 (S.D.Cal. 1983); *James v. Kid Broadcasting Corporation,* 559 F.Supp. 1153, 1156–57 (D.Idaho 1983); *Frye v. Pioneer Logging Machinery Inc.,* 555 F.Supp. 730, 735 (D.S.C.1983).

Additionally, the Court dismisses Rivera's pendent claim in order to avoid important unsettled questions of state law.[25] At issue is whether PRTC is entitled to immunity under Puerto Rico's Worker's Accident Compensation Act (WACA). While the Puerto Rico Supreme Court, in *Odriozola v. Superior Cosmetics,* 116 D.P.R. 485 (1985), allowed an action for damages against an employer, who otherwise would have been covered by WACA, that case

involved a claim under Law 100, 29 L.P.R.A. § 146, which specifically establishes a private cause of action for damages for age discrimination.

In this case, Rivera seeks relief under Law 44, 1 L.P.R.A. § 501, *et seq.,* the scope of which is unclear. Even if Law 44, which covers discrimination of the handicapped, does not contemplate a private cause of action for damages, WACA may still not provide immunity for PRTC, as discrimination in employment *per se* may be enough to take PRTC beyond WACA's shield. Ultimately, the determination of these issues is a "[n]eedless decision[ ] of state law" which is more appropriately resolved by the "surer-footed" state court.[26] *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139. *See e.g. Guzman Robles v. Cruz,* 670 F.Supp. 54 (D.P.R.1987) (declining the exercise of jurisdiction in part because issue of unsettled issue of state law); *Frye v. Pioneer Logging Machinery, supra,* 555 F.Supp. at 736 (same); *Sanders v. Duke University,* 538 F.Supp. 1143, 1148 (M.D.N.C.1982) (same).

### VI.

PRTC's motion to dismiss Rivera's monetary claim for mental suffering is hereby GRANTED. PRTC's motion to strike Rivera's request for a jury trial is hereby GRANTED. Rivera's pendent local claims are hereby DISMISSED without prejudice.

IT IS SO ORDERED.

---

**24.** Rivera alleges an invasion of personal dignity and integrity under Article II § 8 of the Puerto Rico Constitution, as well as a tort claim for intentional infliction of emotional distress under Articles 1802 and 1803 of the Puerto Rico Civil Code, 31 L.P.R.A. §§ 5142, 5143. She is seeking six million dollars in damages.

**25.** This case is distinguished from the Court's decision in *Rosa v. Burns & Roe Services Corp.,* 726 F.Supp. 350 (D.P.R.1989). In that case the Court exercised jurisdiction over pendent state claims permitting compensatory damages in a Title VII action. There, however, the Court noted that by assuming jurisdiction it would *not* be presented with any unsettled questions of state law. *Id.* at 353.

**26.** Congress recently codified courts' powers of supplemental jurisdiction at 28 U.S.C.A. § 1367. In relevant part, this statute states that the "district courts may decline to exercise supplemental jurisdiction ... if (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction." 28 U.S.C.A. § 1367(c)(1) and (2). This enactment, although not strictly applicable to this case since it applies only to civil actions commenced on or after December 1, 1990, nonetheless supports the Court's view that the exercise of pendent jurisdiction in this case is inappropriate.